Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Avenue
7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9478

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

YESH MUSIC, LLC,  and JOHN K. EMANUELE,
individually and on behalf of all other similarly
situated copyright holders,

|                        |
|------------------------|
Plaintiffs,

v.

S. CARTER ENTERPRISES, LLC,  BLACK
PANTHER BIDCO, LTD, and ASPIRO AB,

Defendants.
-----------------------------------------------------------------x

Index No.: 16-cv-1521

**CLASS ACTION COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT AND UNDERPAYMENT OF ROYALTIES**

Plaintiffs YESH MUSIC, LLC and JOHN EMANELE, by and through their attorneys at GARBARINI FITZGERALD P.C., bring this Class Action Complaint and Jury Demand against Defendants S. CARTER ENTERPRISES, LLC, BLACK PANTHER BIDCO, LTD., and ASPIRO AB based on the systematic infringement of Plaintiffs' and the Putative Class' copyrighted musical Compositions pursuant to the Copyright Act and Copyright Revisions Act, 17 U.S.C. §§ 101 *et seq*. (the "Copyright Act" or "Act"), and Defendants' material breach of the calculation of the compulsory royalty rates owed Plaintiffs and the Putative Class of copyright holders that received royalties.

## NATURE OF THE ACTION

1.      Defendant ASPIRO is a media technology company that owns and operates interactive subscription music streaming services TIDAL and WiMP.  WiMP started in 2011, and TIDAL was introduced in 2014. (The TIDAL and WiMP services are referred to here collectively as the "TIDAL Music Service" or "TIDAL Service".)

2.      In the first quarter of 2015, Defendant ASPIRO was sold to Defendant BLACK PANTHER BIDCO, LTD. ("BIDCO"), which is a holding company owned by Defendant S. CARTER ENTERPRISES, LLC ("CARTER").  The primary stake holder, Shawn "Jay-Z" Carter, made it very clear that he would directly be involved in taking the Tidal Service in a new direction at re-launch.

3.      The TIDAL Music service is subject to § 115 of Title 17 of the United States Code.  As such, Defendants were required to serve a Notice of Intent to Obtain Compulsory License ("NOI"), in the form proscribed by 37 CFR § 201.18, within thirty (30) days from the date each copyrighted musical composition was included on its service.

4.      Plaintiffs are the beneficial rights holders to one hundred and eighteen (118) copyright registrations covering one hundred and forty eight (148) musical recordings which Defendants have reproduced and distributed through the TIDAL Music Service without a license.

5.      Plaintiff YESH did not receive any NOIs from TIDAL, but did receive 4 facially invalid NOIs in 2014 from WiMP.  The NOIs were invalid because the recordings identified in

the NOIs had been on the WiMP service for between one and three years prior to the date of service.  The NOIs also stated an incorrect start date, and all have lapsed without renewal.

6.     Plaintiff EMANUELE has not received an NOI or been paid royalties from either the WiMP or TIDAL streaming services.

7.     Plaintiff YESH has not received mechanical royalties from the WiMP streaming service, and only reduced royalties from the TIDAL streaming service.

8.     Ironically, when Defendant CARTER purchased the TIDAL Music Service in 2015, it claimed it would be the first streaming service to pay the artists.  Different owner, same game.

9.     This action is brought by Plaintiffs, on behalf of themselves, and the numerous other similarly-situated holders of the publishing rights, referred to as the "mechanical rights", in copyrighted musical Compositions which Defendants reproduced and distributed without a "mechanical license", service of an NOI, and/or payment of royalties.  Defendants' systematic failure to obtain mechanical licenses is part of an egregious, calculated, and ongoing campaign of deliberate copyright infringement.  This action also seeks to address Defendants' material breach of the calculation of the compulsory royalty rates owed Plaintiffs and the Putative Class of copyright holders that received royalties.

10.     The forgoing is part of Defendants' calculated business plan to avoid he costs associated with properly serving NOIs, and to retain royalties for which  they have no right. Defendants are liable for their intentional infringement of each of the one hundred and eighteen

(118) registrations in the amount of $150,000 per registration, but in no case less than $30,000 per registration and/or Defendants' profits, attorneys' fees, and costs.

## PARTIES

11.     At all times material hereto, Plaintiff Yesh Music, LLC ("YESH") was, and is, a limited liability company organized under the laws of the State of New York, with its principal offices located at 75-10 197th Street, Flushing, New York.  YESH is engaged in, among other things, the business of music publishing and otherwise commercially exploiting its copyrighted sound recordings of the band *The American Dollar*.  The sole members of Plaintiff are Richard Cupolo and John Emanuele, who are also the sole composers of the Copyrighted Compositions.

12.     At all times material hereto, Plaintiff John K. Emanuele ("EMANUELE") was, and is, an individual and resident of Queens.  EMANUELE released two collections of songs under the name "Zero Bedroom Apartment", which Defendant elected to exploit.  EMANUELE received neither an NOI, royalty, nor statement of account.

13.     Plaintiffs are informed and believe, and on that basis aver, that Defendant S. Carter Enterprises, LLC ("CARTER") is a New York limited liability company with a headquarters located at 1411 Broadway, 39th Floor. New York, NY 10018.  CARTER may be served through C/O CORPORATE CREATIONS NETCOMPOSITION INC., 15 North Mill Street, Nyack, NY, 10960.

14.     Plaintiffs are informed and believe, and on that basis aver, that BLACK PANTHER BIDCO LTD ("PANTER") is a shell company with a headquarters located at 1411

Broadway, 39th Floor. New York, NY 10018.  CARTER may be served through C/O

CORPORATE CREATIONS NETCOMPOSITION INC., 15 North Mill Street, Nyack, NY,

10960.

15.     Defendant Aspiro AB ("ASPIRO") is a Norwegian/Swedish company that is

currently a wholly owned BIDCO which is a wholly owned subsidiary Defendant CARTER.

When CARTER purchased ASPIRO (through BIIDCO) in 2015, Defendant CARTER made it

clear that it would be controlling the operations of the TIDAL Music Service.

## JURISDICTION AND VENUE

16.     The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1338 in that

this controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C.

§ 101 et seq.).  This action is a civil action over which this court has original jurisdiction.

17.     Jurisdiction also exists pursuant to 28 U.S.C. § 1332(d)(2) because the matter in

controversy exceeds the sum or value of $5,000,000 (exclusive of interest and costs), is a class

action in which a member of the proposed class, including Plaintiff, is a citizen of a state

different from Defendants, and the number of members of the proposed class exceeds 100.

18.     On information and belief, a substantial part of the facts of infringement

complained of herein occurs or has occurred in this District, and Defendant is subject to personal

jurisdiction in this District.

19.     Personal jurisdiction over Defendant CARTER is proper in this Court, among

other reasons, on the grounds that CARTER through its interactive web-based subscription

service which caused the unlicensed distribution of the Copyrighted Compositions throughout

the State of New York, including within this Judicial District.  CARTER also maintains a
headquarters in this Judicial District.  Other wrongful conduct alleged herein, occurred, in part,
in the State of New York and in this Judicial District.

20.    The Court has personal jurisdiction over Defendant CARTER pursuant to CPLR §
302 (New York's long-arm statute) due to its continuous and systematic business activities
within New York as described below.

21.    Personal jurisdiction over Defendant ASPIRO is proper in this Court, among
other reasons, on the grounds that ASPIRO through its interactive web-based subscription
service which caused the unlicensed distribution of the Copyrighted Compositions throughout
the State of New York, including within this Judicial District.  Other wrongful conduct alleged
herein, occurred, in part, in the State of New York and in this Judicial District.

22.    The Court has personal jurisdiction over Defendant ASPIRO pursuant to CPLR §
302 (New York's long-arm statute) due to its continuous and systematic business activities
within New York as described below.

23.    Personal jurisdiction over Defendant BIDCO is proper in this Court, among other
reasons, on the grounds that BIDCO through its interactive web-based subscription service
which caused the unlicensed distribution of the Copyrighted Compositions throughout the State
of New York, including within this Judicial District.  Other wrongful conduct alleged herein,
occurred, in part, in the State of New York and in this Judicial District.

24.     The Court has personal jurisdiction over Defendant BIDCO pursuant to CPLR §

302 (New York's long-arm statute) due to its continuous and systematic business activities

within New York as described below.

25.     Venue in this District is proper under 28 U.S.C. § 1391(b) and (c) and/or 28

U.S.C. § 1400(a).

26.     Plaintiffs have the right to bring the within action pursuant to 17 U.S.C. § 501(b).

27.     Copies of each certificate issued by the U.S. Copyright Office to Plaintiffs and

assignments registered with the U.S. Copyright Office are annexed and incorporated hereto

respectively as **Exhibits A** and **B.**  Alternatively, the registrations for the groupings are attached

as **Exhibit C.**

28.     Each of Plaintiffs' Copyrighted Compositions was registered prior to the alleged

infringement, and satisfies the registration prerequisite under 17 U.S.C. 412(c).

## FACTS

29.     WiMP was launched by Defendant ASPIRO in 2011, ostensibly as a competitor

to Spotify.  TIDAL was unveiled in October 2014 with a unique selling point: high fidelity music

and an artist-owned collective.  The two services were rolled up into a single entity in 2015.

30.     ASPIRO's 2015 financial filing states it had 512,000 paying subscribers.

31.     The TIDAL Service claims it is the premium service geared towards audiophiles,

and calls itself the "first music streaming service that combines the best High Fidelity sound

quality, High Definition music videos and expertly Curated Editorial."

32.     The TIDAL Service claims it has over 25 million tracks and 85,000 music videos.

33.     The platform has no free tier, instead offers two payment plans: a $9.99-per-month tier for standard-quality sound (comparable to the quality other streaming services deliver), HD videos and curated content, and a $19.99-per-month tier high-definition audio (comparable to CD quality, sometimes described as "lossless high-fidelity sound"), HD videos and curated content.

34.     The TIDAL Music Service was touted as an artist-owned service because it has 16 "celebrity" stakeholders.

35.     Defendants are experts on the NOI process and royalty rates.  CARTER and BIDCO are owned by entertainer Shawn "Jay-Z" Carter, as well as 16 artist stakeholders (Shawn Carter himself, Beyonce, Rihanna, Kanye West, Jack White, Arcade Fire, Usher, Nicki Minaj, Coldplay, Alicia Keys, Calvin Harris, Daft Punk, deadmau5, Jason Aldean, J. Cole and Madonna), and equity investments by three record companies (i) Universal Music Group (most of EMI's recorded music division absorbed into UMG), (ii) Sony Music Entertainment (EMI Music Publishing absorbed into Sony/ATV Music Publishing), and (iii) Warner Music Group (EMI's Parlophone and EMI/Virgin Classics labels absorbed into WMG on 1 July 2013).

36.     Each of the forgoing parties would be considered an expert on Defendants legal obligation to serve NOIs.

37.     The TIDAL Music Service is currently accessible on the desktop (though the lossless streaming feature is only available for Chrome) as well as iOS and Android apps in these countries: Australia, Austria, Belgium, Canada, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hong Kong, Hungary, Ireland, Italy, Latvia, Lithuania,

Luxembourg, Malta, Netherlands, Norway, Poland, Portugal, Romania, Singapore, Slovakia, Slovenia, South Africa, Spain, Sweden, Switzerland, Turkey, United Kingdom and the U.S.

38.     Plaintiffs and the Putative Class own the mechanical rights to musical compositions in the United States.  Each of Plaintiffs' and the Putative Class' Copyrighted Compositions was registered within three months of publication, or one month after publication on Defendants' TIDAL Music System's use, and satisfies the registration prerequisite under 17 U.S.C. 412(c).

39.     Pursuant to the Copyright Act, Plaintiff and the Putative Class possess exclusive rights regarding the reproduction and/or distribution of the Copyrighted Compositions, including the associated licensing rights to such activities.

40.     Plaintiffs and the Putative Class distribute, sell and/or license their Copyrighted Compositions in the form of CDs, and other tangible media throughout the United States, including in New York.  Plaintiffs and the Putative Class reproduce, distribute, sell, and/or license the copyrighted Compositions in the form of digital audio files delivered and performed via the Internet.

41.     Plaintiffs and the Putative Class have invested and continue to invest substantial money, energy, time, effort and creative talent to create and develop the Copyrighted Compositions.

42.     Defendants' interactive commercial music streaming service can be found at <http://: www.tidal.com>, permitting users to customize listening choices for recorded music.

Its Internet services are downloadable to computers and handheld devices (via mobile applications) making its streaming capabilities widely available to millions of users.         '

43.     With The TIDAL Music system, the user can stream and/or download music as well as create playlists and artist based stations for the user's tablet, PC, TV and phone.

44.     Indeed, Defendants have optimized their website for use on iOS and Android-based devices thereby reaching vast markets of users.

45.     Defendants' TIDAL Music Service is intended to and does promote its services in a manner designed to attract paid subscribers of its services.

46.     Defendants regularly reproduced and/or distributed to listeners and users of its Service, Plaintiffs' and Putative Class Members' musical compositions, and have done so repeatedly for at least the past three years.  Defendants created its now 25 million track library by dumping all of the music from independent artists into the TIDAL Music Service without serving NOIs.  Independent artists are predominantly impacted by Defendants' systematic infringement.

47.     Defendants have not licensed the mechanical rights to the musical compositions o Plaintiffs' and the Putative Class Members' or otherwise received authorization from them to reproduce or distribute such Compositions to its users and subscribers.

48.     Defendants' unlawful reproduction and/or distribution of Plaintiffs' and Putative Class Members' copyrighted Compositions have substantially harmed, and continues to harm, Plaintiffs and the Putative Class.

49.     A non-exhaustive and illustrative list of Plaintiffs' Copyrighted Compositions which Defendants have illegally reproduced and/or distributed for its users, includes, but is not

limited to those identified in **Exhibits A, B,** and **D**.  Plaintiffs have received Certificates of

Copyright Registration from the Register of Copyrights for each of their Copyrighted

Compositions.

50.     The Copyright Act provides statutory penalties to discourage Defendants'

infringement, including statutory damages awards of between $750 and $30,000 for each

infringed Composition, and up to $150,000 for a willful infringement.

51.     At no time have Defendants paid Plaintiffs or the Putative Class any/or proper

royalties.


### COPYRIGHT INFRINGEMENT FACTS APPLICABLE TO ALL PLAINTIFF AND THE PUTATIVE CLASS

52.     As a general proposition, a copyright confers on the owner the exclusive right to

reproduce the copyrighted Composition.

53.     Absent a license from the copyright owner, which the owner is free to grant or

deny, reproduction of the Composition by another constitutes copyright infringement.

54.     When Congress enacted the Copyright Act of 1909, it was concerned that

exclusivity with respect to musical compositions would give rise to "a great music monopoly."

It therefore modified the principle of exclusivity in the case of nondramatic musical

Compositions by enacting a compulsory license provision which, in defined circumstances,

imposed upon the copyright owner a license permitting the mechanical recording of the

copyrighted song "on such media as a phonograph record or a piano roll."

55.     Although recording technology has changed since 1909, licenses to record musical compositions on such media continue to be called "mechanical licenses."

56.     The compulsory mechanical license concept was carried forward in Section 115 of the Copyright Act of 1976 which, generally speaking, permits one wishing to record a copyrighted nondramatic musical Composition to do so in the absence of the copyright owner's consent in exchange for payment of a statutory royalty.  But the availability of compulsory mechanical licenses is dependent on the strict limitations of Section 115(b)(1) of the Act which requires in pertinent part that "[a]ny person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the Composition, serve notice of intention to do so on the copyright owner."

57.     Under section 115, those who seek to make and distribute reproductions of a musical Composition may obtain a license to do so by serving a NOI on the copyright owner, no later than thirty days after making, and before distributing, any phonorecords. 17 U.S.C. § 115(b)(1).  Once an entity has served the NOI, that entity must provide statements of account and pay the statutorily prescribed royalties on a monthly basis. 17 U.S.C. § 115(c)(5).

58.     If the name and address of the owner of the Composition cannot be identified from the public records of the Copyright Office, the user may file the NOI with the Office. 17 U.S.C. § 115(b)(1).  In that case, the user must pay a filing fee to the Office but does not need to deposit royalties. See 17 U.S.C. § 115(c)(1); 37 C.F.R. § 201.18(f)(3).

59.     Under Section 115, the consequences of any lapse are severe: "failure to serve or file the notice required by clause (1) forecloses the possibility of a compulsory license and, in the

absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement ...”

60.    Defendants failed to serve NOIs or timely NOIs for Plaintiffs' and the Putative Class' Copyrighted Compositions.

61.    Defendants' failure to serve NOIs before the start of distribution precludes the creation of a compulsory license, and it does so both as to copies distributed prior to service and as to copies distributed thereafter.

62.    The tremendous power granted to Defendant under Section 115 is balanced by the strict obligations regarding notice.  Defendant intentionally failed to adhere to its Section 115 obligations, while enjoying all of the benefits afforded by Section 115.

## UNDERPAYMENT OF ROYALTIES

63.    Defendants' systematic underpayment of royalties was done in several ways. First Defendants deliberately miscalculating the per-stream royalty rates by including millions of streams Defendants do not pay royalties in the calculation.  This diluted the paid per-stream rate for royalty payments by up to 35%.

64.    Next Defendants systematically undercut the calculation of mechanical royalties to Plaintiff and the Putative Class by illegal deals with equity investor partners

65.    Finally, Defendants failed to serve monthly detailed reports as required by the statute.

66.    The royalty rate to make reproductions of musical compositions in connection with interactive streaming, limited download services, and certain other services is a percentage

of the service's revenue ranging from 10.5% to 12%, subject to certain minimum royalty floors, and after deducting royalties paid by the service for the public performance of those compositions. See Mechanical and Digital Phonorecord Delivery Rate Adjustment Proceeding, 71 Fed. Reg. 64,303, 64,308-09 (Nov. 1, 2006) (discussing "voluntary license agreements granting the labels the right to create ringtones at specified mutually-negotiated royalty rates").

67.     Interactive streaming sites, like Defendants, often employ third-party administrators like the Harry Fox Agency, a nonexclusive licensing agent, and Music Reports, Inc., to serve their NOIs and calculate the mechanical royalty rates.

68.     Defendants, however, know full well that Harry Fox and Music Reports do not even try to serve NOIs in accordance with § 115, or calculate proper mechanical royalty rates unless expressly directed.

69.     MusicReports stated in a correspondence to the General Counsel and Associate Register of Copyrights U.S. Copyright Office, Library of Congress dated May 23, 2014:

> Regarding the licensing coverage of the Section 115 license: it is true, as critics have pointed out, that it is not possible to license all of the tens of millions of musical compositions in the typical digital music service catalog using the Section 115 statutory license.
>
> ***                    ***                    ***
>
> It should be noted that currently, it is common for music publishers to grant blanket, voluntary mechanical licenses to their own catalogs to music users including digital music services. In fact, with only a few hundred of such blanket licenses, a digital music service can license most music usage. There is a definite modern trend in favor of this kind of licensing by the major music publishers and largest independents, as opposed to collective licensing through HFA.

See **Exhibit E**.

70.     Defendants made a calculated business decision to avoid the cost of complying with the law.  Instead, Defendants entered into blanket licenses that cover most of the songs in their library, but ignored the 35% made up of independent artists, like Plaintiffs and the Putative Class.

71.     Defendants failed to calculate the correct revenue pool, stream rate, and owe Plaintiffs and the Putative Class all lost royalties.  Defendants' failure was willful.

72.     In a report prepared for Members and Committees of Congress dated May 7, 2015, a concern was raised as follows: "Tidal has received equity investments from record labels in exchange for the rights to license their music catalogs. Such investments could impact the amount of royalties available to artists." James Vincent, "Jay Z Takes on Spotify with $56 Million Purchase of Aspiro," The Verge, January 30, 2015, http://www.theverge.com/2015/1/30/7950317/Jay-z-buys-tidal-wimp-aspiro-to-take-on-spotify. See **Exhibit F**.

73.     The three record companies at issue represent 60% of the market. See Ed Christman, First-Quarter Music Publishing Rankings: SONGS Surges Again, BILLBOARD, (May 12, 2014), http://www.billboard.com/biz/articles/news/publishing/6084783/first-quarter-music-publishing-rankings-songs-surges-again; (Tidal received equity investments from record labels in exchange for the rights to license their music catalogs.  Dana A. Scherer, Money for Something: Music Licensing in the 21st Century, pg. 22, May 7, 2015.)

74.     As the Congressional Report, Money for Something: Music Licensing in the 21st Century, warned, equity investments could impact the amount of royalties available to artists.

75.     The mechanical royalty rates that interactive services pay independent artists are tied to the rates that the services pay record labels for mechanical rights, which are (theoretically) negotiated in the free market.

76.     By taking equity stakes in the TIDAL Music Service, the major record labels made it very clear that this was not a free market.  This has further illegally devalued the mechanical rates paid by Defendants.

77.     As described in "Reproduction and Distribution Licenses (Mechanical Licenses)," the rates that interactive services pay are tied to the rates that the services pay record labels for mechanical rights, which are negotiated in the free market. This means that if a record label's deal includes an equity stake in an interactive digital music service provider or a guaranteed allotment of advertising revenues, those items should be assigned a value when estimating the total cost and actual revenue because this is not a free market.

78.     The overall impact of the forgoing is a further illegal devaluation of the royalty rate paid to artists.

79.     Defendants failed to serve monthly reports which detail the usage of every song and calculation of royalties.

## CLASS ALLEGATIONS

80.     Plaintiffs brings this action on behalf of themselves and on behalf of all other similarly situated owners of mechanical rights for registered musical compositions, whose rights were improperly infringed by Defendants' unlicensed and/or unauthorized reproduction and/or

distribution of the Copyrighted Compositions failure to properly calculate royalties, and failure to provide monthly statements detailing every track.

81.    Defendants failed to serve an NOI or a timely NOI for all of the Plaintiffs' and Putative Class' Copyrighted compositions.

82.    The infringement of Plaintiffs' and the Putative Class Members' mechanical rights was, and is, knowing and willful.

83.    Defendants: (i) deliberately obfuscated the correct number of streams used in the calculation by including tens of millions of streams it was not paying royalties in a deliberate move to reduce the per-stream rate to all artists that receive mechanical royalties, including Plaintiffs and the Putative Class, (ii) illegally reduced the revenue calculation used in conjunction with the royalty payments, and (iii) failed to provide an accurate accounting to Plaintiffs and the Putative Class.

84.    Defendants also allowed the deals with their own equity investor record labels reduce the mechanical royalty rates paid to Plaintiff and the Putative Class.

85.    This action is necessary to protect the property rights of Plaintiffs and all others similarly situated holders of the publishing rights who have been damaged due to Defendants' calculated and unlawful infringement, and reduction in the per-stream rate to all publishing rights holders who received royalties from Defendants' interactive streaming product.

86.    The CLASS is comprised of and defined as follows:

"All owners of mechanical distribution and reproduction rights in musical compositions registered under United States federal law, which compositions were reproduced or distributed by WiMP or TIDAL without license or authorization since February 27, 2013 and were registered within 90 days of first

publication or 30 days of being uploaded, distributed and reproduced on the TIDAL Music Service."

"All owners of mechanical distribution and reproduction rights in musical compositions registered under United States federal law, which compositions were reproduced or distributed by Defendants since February 26, 2013 and received royalty payments for Defendants' distribution and reproduction through their TIDAL and WiMP interactive streaming services system."

87.     This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are clearly and easily ascertainable and identifiable.

88.     The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  Plaintiffs are informed and believe that there are thousands of class members and that those class members can be readily ascertained from Defendants' database files and records, and via discovery in this action.

89.     Plaintiffs and the Putative Class hold the rights to many copyrighted musical compositions which Defendants have reproduced and/or distributed without license and without proper payment of royalties or accounting for royalties.

90.     Plaintiffs and the Putative Class have sustained actual pecuniary loss and face irreparable harm arising out of Defendants' systematic and unlawful diminution of the royalty payments with accounting for those payments as described herein.

91.     Upon information and belief, Defendants have maintained records of the musical compositions it reproduces or distributes.

92.     The Putative Class Members can be readily located and notified of this action.

93.     The claims of Plaintiffs are typical of the claims of the members of the Putative

Class, and their interests are consistent with and not antagonistic to those of the other Putative

Class members they seek to represent.

94.     Plaintiffs and the Putative Class hold the "mechanical rights" to numerous

copyrighted musical compositions which Defendants have reproduced and/or distributed without

license and without providing an NOI to Plaintiffs or the Putative Class as required by § 115 of

the Act.

95.     Plaintiffs, and all members of the Putative Class, have sustained actual pecuniary

loss and face irreparable harm arising out of Defendants' continued infringement as complained

of herein.

96.     Plaintiffs have no interests that are adverse to, or which conflict with, the interests

of the absent members of the Putative Class and is able to fairly and adequately represent and

protect the interests of such a class.

97.     Plaintiffs have raised a viable copyright infringement claim of the type reasonably

expected to be raised by members of the Putative Class, and will vigorously pursue those claims.

98.     If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to

include additional class representatives to represent the Putative Class or additional claims as

may be appropriate.

99.     Plaintiffs are represented by experienced, qualified and competent counsel who is

committed to prosecuting this action.

100.    Common questions of fact and law exist as to all members of the class that predominate over any questions affecting only individual members of the class.

101.    These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member include, without limitation, the following:

a)    whether Defendants reproduced or distributed or otherwise exploited via its TIDAL Music service registered musical compositions without first serving an NOI, or obtaining a license or other required authorization;

b)    whether Defendants' reproduction, distribution or other exploitation of registered musical compositions without first obtaining a license or other required authorization constitutes a violation of the Copyright Act, 17 U.S.C. §§ 106 and 501;

c)    whether Defendants' unauthorized reproduction, distribution or other exploitation of registered musical compositions was done willfully, thereby entitling the members of the class to increased statutory damages;

d)    whether Defendants violated of New York's General Business Law § 349 for unfair and unlawful business practices;

e)    whether Defendants' violation of New York's General Business Law § 349 is continuing, thereby entitling Class Members to injunctive or other relief;

f)    the basis and method for determining and computing damages;

g)    whether Defendant ASPIRO alone is liable for all pre-2015 damages;

h)    whether Defendants made accurate royalty payments for the musical compositions it reproduced or distributed;

i)    whether Defendants impermissibly reduced the Royalty Rate Pool by the inclusion millions of unlicensed (and uncompensated) streams;

j)    whether Defendants impermissibly reduced the Per-Composition Royalty Allocation for Each Relevant Composition by the inclusion of unlicensed activity.

k)    whether Defendants impermissibly calculated the Per-Play Allocation;

l)    whether Defendants failed to disclose its statutory obligation of the percentage of service revenue;

m)    whether Defendants failed to make the calculations required in good faith and on the basis of the best knowledge, information and belief of the licensee at the time payment is due, and subject to the additional accounting and certification requirements of 17 U.S.C. 115(c)(5) and § 201.19.

n)    whether Defendants failed to provide a statement of account which shall set forth each step of its calculations with sufficient information to allow the copyright owner to assess the accuracy and manner in which the licensee determined the

payable royalty pool and per-play allocations (including information sufficient to demonstrate whether and how a minimum royalty or subscriber-based royalty floor pursuant to § 385.13 does or does not apply) and, for each offering reported, also indicate the type of licensed activity involved and the number of plays of each musical Composition (including an indication of any overtime adjustment applied) that is the basis of the per-Composition royalty allocation being paid;

o) whether Defendants failed to provide an accurate list of every stream of a sound recording that occurred in the digital music service in that month to these third party companies;

p) whether Defendants failed in providing monthly reporting of royalties on a song-by-song basis;

q) the basis and method Defendants used to calculate the per-play allocation and revenue pool; and,

r) whether Defendants' conduct is continuing, thereby entitling Plaintiffs and Members of the class to injunctive or other relief.

102. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all class members is impracticable.

103. The claims of the individual members of the class may range from smaller sums to larger sums, depending upon the number of infringements. Thus, for those Putative Class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually. Even if every member of the class could afford to pursue individual litigation, which is highly unlikely in the independent artist community, the court system could not.

104. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, contradictory, or inconsistent judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

105.    On the other hand, the maintenance of this action as a class action presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the class.

106.    Plaintiffs anticipate no difficulty in the management of this action as a class action.

## FACTS APPLICABLE TO YESH

107.    YESH consists of two men who have been professional musicians since they were 16 years old.  In fact, at 16 years old, John Emanuele and Rich Cupolo played at CBGB and recorded and released two EPs.  While attending Townsend Harris High School in Queens, Emanuele and Cupolo won the Bertlesmann Songwriting contest.  Since they were 25 years old, Emanuel and Cupolo, now thirty, have exclusively earned their living from exploiting their Copyrighted Compositions.

108.    Digital downloads represent 50% of the money generated from the Copyrighted Compositions.  The other 50% comes from licensing for varied uses including motion pictures, commercials, and video games.  Examples of some of the licensed uses are as follows:

| Motion Pictures | Production Company |
|---|---|
| Extremely Loud & Incredibly Close | Warner Brothers |
| Up In The Air | Paramount Pictures |
| Coast Modern | Two Fold Film |

| | |
|---|---|
| Damnation | Felt Soul Media |
| Eastern Rises | Felt Soul Media |
| Officer Down | Felt Soul Media |
| Yami no Ichi Nichi | Mario Junncompos |
| Nuclear Family | Ian Hawkins |

| Television Program | Production Company |
|---|---|
| CSI: Miami | CBS/Paramount |
| Spring Watch | Fox Television |
| Nike Battlegrounds | MTV/Viacom |
| Real World/Road Rules | Bunim Murray/MTV |
| Red Band Society | Fox Television |
| Hawthorne | TNT Network |
| Human Planet | Discovery Network |
| Outside Today | Outside TV |
| Mrs. Eastwood & Co | Bunim Murray/MTV |
| Teen Mom | MTV/Viacom |
| Sixteen and Pregnant | MTV/Viacom |
| Keeping Up With The Kardashians | Bunim Murray/E Television |
| Alaska: The Last Frontier | Discovery Network |
| The Vineyard | ABC Family |

| | |
|---|---|
| Gott und die Welt | German TV ARD |
| America's Psychic Challenge | Bunim Murray Productions |
| Caged | MTV/Viacom |
| True Life | MTV/Viacom |
| This Is How I Made It | MTV/Viacom |
| TO Show | VH1/Viacom |
| Styl'd | MTV/Viacom |
| Life of Ryan | MTV/Viacom |
| If You Really Knew Me | MTV/Viacom |
| Taboo Nation | National Geographic |
| Shahs of Sunset | Ryan Seacrest Productions |
| How I Rock It | Ryan Seacrest Productions |
| Popland | MTV/Viacom |

| Commercials | Company |
|---|---|
| Infiniti Automobile | Infiniti Automobiles |
| Samsung Smart TV | Samsung |
| GoPro Camera | GoPro Cameras |
| Elle Magazine UK \| Dubai Teaser | Elle Magazine UK |
| Pre-Auction Statement | Leonardo DiCaprio Foundation |
| Subaru Online Advertisement | Subaru (Switzerland) |
| Burton Snowboard | Burton Snowboards |
| O'Neill Europe Advertisements | O'Neill Europe |
| Dove | Dove |
| DC Shoes | DC Shoes |
| Converse Web | Converse |
| NBA Playoffs Commercial | ESPN |
| CanonOptics Advertisement | CanonOptics/Burton |

| Telluride Tourism Board | Telluride Tourism Board |
|---|---|
| Unit Clothing | Unit Clothing Enter. |
| Viasat Baltics | Viasat Baltics |
| Morgan Stanley | Morgan Stanley/Chief Ent. |

| Video Game | Company |
|---|---|
| The Amazing Spiderman | Activision |

109.    Plaintiff Yesh is the sole beneficiary of all right, title and interest in, and to, the copyrighted compositions identified in **Exhibits A, C,** and **D.**

110.    As **Exhibit A, B,** and **C** to this Complaint demonstrates, Plaintiff YESH has complied with all laws pertinent to the Copyrighted Compositions as a copyrighted Composition and, in particular, has applied for and received the Certificates of Copyright Registration from the Register of Copyrights for the Copyrighted Compositions.

111.    Defendant began distributing one hundred twenty three (123) musical compositions of Plaintiff YESH identified in **Exhibit D**, which were covered by 116 copyright registrations as shown in **Exhibit A,** and alternatively, **Exhibit C**.  Defendant failed to serve an NOI for any recording.

112.    Plaintiff YESH made numerous submissions of groups of tracks, for review by Defendants through TuneCore.

113.    Pursuant to Plaintiff YESH's agreement with TuneCore, Plaintiff checks a box that says "Deliver Here" which guarantees nothing but an audition with the selected digital store. Defendants were just one of the "selected stores" chosen by Plaintiff to be sent the master audition recordings of the Copyrighted Compositions.

114.    The license for the physical sound recordings here -- Master Recording License -- was granted to Defendants through TuneCore.  TuneCore functions like a music label, allowing artists to submit the master recordings through TuneCore to various "Digital Stores" for review.

115.    At no time did TuneCore hold itself out as conveying a mechanical license for the compositions submitted on behalf of Plaintiff YESH.  Further, it is axiomatic that a mechanical license to record and distribute the songs must be obtained in order to lawfully make the recordings available for temporary stream or permanent download.

116.    Defendants did not serve an NOI for any of the forgoing recordings, instead it dumped the recordings into its library, with complete disregard for the rights of Plaintiff YESH.

117.    After receipt of the master audition recordings, Defendants may elect to exploit the masters, or reject one or all of the sound recordings due to "technical or editorial specifications."

118.    Defendants had the option to upload some or all of the Copyrighted Compositions onto the TIDAL Music Service.  For every copyrighted recording Defendant elected to upload onto its service, it was required to serve a Notice of Intent for a Compulsory License ("NOI") within 30 days of upload.

119.    Defendants did elect to exploit the sound recordings of the Copyrighted Compositions, but elected to do so with no license or authority. See **Exhibit G**.  Defendant TIDAL failed to obtain mechanical licenses for the two hundred and seventy (270) tracks on the TIDAL Music system under 17 U.S.C. § 115 for the distribution of the Copyrighted Compositions.

120.     The failure to serve timely NOIs renders the distribution of the Copyrighted

Compositions unlicensed and thereby violates my Plaintiffs' exclusive rights pursuant to 17

U.S.C. §§ 106 and 114.

121.     As a result, Defendant lost its right to serve compulsory licenses for Plaintiff

YESH's Copyrighted Compositions.  Further, Defendant's failure to comply with Section 115

was done as a matter of cost-cutting business practice, and only an award at the higher end of the

statutory framework will serve to curtail Defendant's predatory behavior as detailed below.

122.     Defendant TIDAL knew who the Plaintiff was, after all it listed "Yesh Music" is

listed as the record label for the band *The American Dollar* on its website. (Yesh Music was a

partnership formed in 2006 which was the predecessor to Plaintiff Yesh Music, LLC.).  Each

submission from TuneCore identified the composers and record label.  Defendant uploaded not

just Plaintiff's music to its service, but the album cover art and listed the name of the record label

– "Yesh Music" and artists.

123.     In less than a few minutes, Defendants could have complied with Section 115's

notice requirements – the NOIs – but it elected not to as part of a cost-cutting business decision.

124.     Defendants were contacted by correspondence from counsel dated June 8, 2015,

but elected to ignore Plaintiffs' counsel and continue to stream the Copyrighted Compositions.

See **Exhibit H**.

125.     Defendants intentionally infringed YESH's one hundred and sixteen (116)

Copyrighted Compositions, by, among other things, making the Copyrighted Compositions

available for unlawful and unauthorized digital download and distribution to the public through

its interactive Internet subscription music service found at <http://music.tidal.com>.

### THE YESH NOIs

126.    Defendant served four NOIs through WiMP Music on November 14, 2014.

| NOI Date | Distribution Date | No. of Tracks Covered by NOI | No. of Tracks on TIDAL |
|----------|-------------------|------------------------------|------------------------|
| 11/14/2014 | 11/14/2014 | 12 | 144 (for over a year) |
| 11/14/2014 | 11/14/2014 | 30 | 144 |
| 11/14/2014 | 11/14/2014 | 1 | 144 |
| 11/14/2014 | 11/14/2014 | 6 | 144 |

127.    Each of the NOIs (attached as **Exhibit I**) failed to account for the vast majority of

tracks released in various groupings to Defendant for review.

128.    Not a single NOI was served remotely close to 30 days of the corresponding

recording being published by Defendants.

129.    Each of the NOIs was a license for one year and expired without renewal.

130.    As a result, Defendants lost their right to serve compulsory licenses for Plaintiff

YESH's Copyrighted Compositions.

131.    Each NOI was invalid because it was pre-dated, and not served within thirty (30)

days of the two recordings being made available.

132.    All of the NOIs were for "the calendar year" and have expired without renewal.

133.    As of the date of this Complaint, there is not a single valid NOI covering any of Plaintiff YESH's Copyrighted Compositions on TIDAL Service.

134.    On or about June 8, 2015, Defendants were contacted by correspondence from Plaintiffs' counsel, and notified that YESH had not received valid NOIs for any of the musical compositions being streamed on the TIDAL Music Service; Defendants did not respond.

135.    In the nine months after Defendants were put on notice by counsel, Defendants have continued to stream YESH's one hundred and sixteen (116) Copyrighted Compositions. This is the definition of "intentional" under 17 U.S.C. § 504(c)(2).  Defendants acted willfully, and wantonly, or at least with reckless disregard to YESH's rights.

136.    Defendants are liable for infringement of YESH's exclusive rights to the Copyrighted Compositions as provided by clauses (1) and (3) of section 106 of the Copyright Act.

137.    Upon information and belief, Defendants made a business decision that it was more cost effective to infringe the copyrights of independent musicians than spend the time and money contacting every rights owner.

**YESH DOES NOT RELEASE COHERENT "ALBUMS"**

138.    When a copyright holder or publisher issues material both on an individual basis and as part of a compilation, the Copyright Act permits a statutory damages award for each individual Composition offered separately.

139.    Only at the very beginning of their career was Plaintiff YESH focused solely on creating traditional albums (cohesive Compositions).

140.    Plaintiff's business model changed early on to focus on licensing individual songs.  The band does not tour.  Instead, it generates revenue from licensing and on-line streaming.

141.    Of the sixteen releases of material by YESH, only seven contained all new tracks. The rest are a mixture of previously released songs, new songs, and old songs remixed to create new licensing opportunities.

142.    For example, the "album" titled "Ambient 3", consists of four original recordings and thirteen remixes of previous recordings.   The one, and only, time this group of seventeen recordings was released together was on September 15, 2012, when it was released to the 31 "digital stores" for consideration.

143.    TuneCore, the entity that submits the recordings, requires all groupings of recordings to be uploaded onto its service as an album.   Plaintiff copyrighted the new and remixed recordings as a group just to protect themselves before releasing them to the public. The individual recordings were copyrighted three months later.

144.    As for a second example, on December 20, 2012, Plaintiff released two "albums" along with ten unrelated recordings to 31 digital stores for consideration.  All of these recordings were previously released in other groupings or were re-worked singles.

145.    As for third example, on December 10th, 2013, Plaintiff released fifty recordings to twenty six digital stores, fifteen of those recordings were also included in the September 15, 2012 grouping.  The rest of the tracks were from earlier recordings or were re-worked singles.

146.    As for a fourth example, on December 12th, 2013, Plaintiff released ten recordings to 31digital stores.  Four of those recordings were included in the September 15, 2012 grouping, the rest were re-released singles.

147.    The shuffling of previous recordings is part of a necessary for Plaintiff's business model, and is designed to increase licensing revenue.  The mere fact that the recordings are shuffled is strong evidence they were not meant to be a logical or cohesive unit.

148.    Plaintiff's three "ambient" releases were marketing releases consisting mainly of remixes from previous albums, varied in nature, designed to increase licensing opportunities for the individual compositions.

149.    Plaintiff YESH does not have "albums" in the traditional sense, but releases collections of individual songs which are not an integrated composition.  For that reason, numerous musical compositions appear in three or four of the collections submitted.

150.    For example, of the 13 collections of songs released by Plaintiff YESH, only 5 have been totally original music.  The rest are mixtures of previously released songs, and re-worked songs.  This is done in order to showcase various recordings for possible licensing deals.

151.    None of the collections is meant to be a cohesive unit; instead, they are constantly shuffled like a deck of cards and re-released.

152.    In fact, Plaintiff YESH affirmatively avoids any of the musical compositions being associated with any other, because this diminishes the licensing opportunities which is 50% of Plaintiff YESHs income.  There is a great need by Plaintiff YESH to create new opportunities for various licensing entities to become aware of the individual tracks.

153.     Tellingly, songs re-released on the numerous compilation albums are often streamed by users far more times than the original release.

154.     Accordingly, no grouping can possibly be considered a coherent unit.

## FACTS APPLICABLE TO PLAINTIFF JOHN K. EMANUELE

155.     Plaintiff EMANUELE released four collections of music to the TIDAL Music Service.  The first collection, titled *Filmmuzic*, had 19 tracks and was made available by Defendants on or about November 2014.  *Filmmuzic* was released in February 2011 and the Copyright Registration date is May 27, 2011.  The second collection, titled *Complete Discography 2009-2013*, was made available by Defendant on or about April 9, 2013, and contained 90 songs. See **Exhibit J**.  The Registration date is February 20, 2013. See **Exhibit B**.

156.     Plaintiff EMANUELLE distributed its music for review purposes only through a company call Tune Core.

157.     Pursuant to Plaintiff EMANUELLE's agreement with TuneCore, Plaintiff checks a box that says "Deliver Here" which guarantees nothing but an audition with the selected digital store.  In or about November 2012, Defendants were one of the "selected stores" chosen by Plaintiff to be sent the master audition recordings of the Copyrighted Compositions.

158.     At no time did TuneCore hold itself out as conveying a mechanical license for the compositions submitted on behalf of Plaintiff.  Further, it is axiomatic that a mechanical license to record and distribute the songs must be obtained in order to lawfully make the recordings available for temporary stream or permanent download.

159.    Defendants had the option to upload some or all of the copyrighted Compositions onto the TIDAL Music System.  For every copyrighted recording Defendants elected to upload onto its service, it was required to serve a Notice of Intent for a Compulsory License ("NOI") within 30 days of upload; it did not.

160.    Defendants did elect to exploit the sound recordings of the Copyrighted Compositions, but elected to do so with no license or authority.  Defendants failed to obtain mechanical licenses under 17 U.S.C.§ 115 for the distribution of the musical Compositions.

161.    Defendant failed to serve an NOI on Plaintiff EMANUELE for any recording at any time.

162.    Defendant failed to pay any royalties to Plaintiff EMANUELE.

163.    Defendant cannot be heard to argue that it has infringed both Registered Copyrights of Plaintiff EMANUELE.

164.    Plaintiff EMANUELE is the sole beneficiary of all right, title and interest in, and to, the copyrighted compositions identified in **Exhibit B.**

165.    Defendants did not serve an NOI for any of the forgoing recordings.  Instead it dumped the recordings into its service, with complete disregard for the rights of Plaintiff.

166.    As of the date of this Complaint, Defendants have failed to serve a single NOI covering any of EMANUELE'S Copyrighted Compositions on TIDAL Music.

167.    The failure to serve timely NOIs renders the distribution of the Copyrighted Compositions unlicensed and thereby violates my Plaintiffs' exclusive rights pursuant to 17 U.S.C. §§ 106 and 114.

168.    As a result, Defendants lost their right to serve compulsory licenses for Plaintiff EMANUELE's Copyrighted Compositions.  Further, Defendants' failure to comply with Section 115 was done as a matter of cost-cutting business practice, and only an award at the higher end of the statutory framework will serve to curtail Defendant's predatory behavior as detailed below.

169.    Defendants knew who Plaintiff EMANUELE was; after all it listed "John Emanuele" on its website.  Each submission from TuneCore identified the composers and record label.  Defendant uploaded not just Plaintiff's music to its service, but the album cover art and listed the name of the record label.

170.    In less than a few minutes, Defendants could have complied with Section 115's notice requirements – the NOIs – but they elected not to as part of a cost-cutting business decision.

171.    Defendants were contacted by correspondence from counsel dated June 8, 2015, but elected to ignore Plaintiff EMANUELE's counsel and continued to stream the Copyrighted Compositions.

172.    In the four months after Defendant was put on notice by counsel, Defendants continued to stream EMANUELE's tracks covered by two (2) Copyright Registrations.  This is the definition of "intentional" under 17 U.S.C. § 504(c)(2).  Defendants, acted willfully and wantonly, or at least with reckless disregard to YESH's rights.

173.    Nine months later, and defendants continue to stream Plaintiff EMANULLE's tracks.

174.    Defendants intentionally infringed EMANUELE's two (2) Copyright

Registrations, by, among other things, making the underlying Copyrighted Compositions

available for unlawful and unauthorized digital download and distribution to the public through

its interactive Internet subscription music service.

175.    Defendants are liable for infringement of EMANUELLE's exclusive rights to the

Copyrighted Compositions as provided by clauses (1) and (3) of section 106 of the Copyright

Act.

176.    Every time Defendants failed to pay Plaintiff EMANUELE royalties, they

knowingly infringed his exclusive right to the recordings underlying his copyright registrations.

177.    Upon information and belief, Defendants made a business decision that it was

more cost effective to infringe the copyrights of independent musicians than spend the time and

money contacting every rights owner.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT

178.    Plaintiffs and the Putative Class incorporate the allegations contained in the

preceding paragraphs as if set forth at length here.

179.    Defendants have, without a "mechanical" license under Section 115 from

Plaintiffs or the Putative Class, reproduced and publicly performed and/or publicly distributed

Plaintiffs' Copyrighted Compositions through its interactive web-based subscription streaming

service.

180.    It cannot be disputed that the Plaintiffs and the Putative Class have valid,

registered copyrights, and that Defendants have reproduced and offered the Copyrighted

Compositions for streaming, including permanent and temporary digital download, without a license, thus infringing Plaintiffs' and the Putative Class' rights under Section 115 of the Copyright Act.  Irreparable injury is presumed here as Plaintiffs and the Putative Class have established a prima facie case of copyright infringement.

181.    Even after Defendants was put on notice, over four months ago, that it had no license or authority, Defendants elected to continue to reproduce and publicly perform and/or publicly distribute Plaintiffs' Copyrighted Compositions through its subscription service.

182.    The making or the distribution, or both, of all Copyrighted Compositions without the payment of royalties is actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

183.    Each time the Plaintiffs and Putative Class were deprived of their statutory royalty entitlement, e.g., by non-payment of royalties, a distinct harm was done to Plaintiffs' and the Putative Class' property interest.

184.    Defendants' continued streaming of Plaintiff's Copyrighted Compositions, after it was served with notice on June 8, 2015, is clearly an intentional infringement under the Act.

185.    Defendants failed to serve a single valid NOI.

186.    Defendants' predatory conduct was clearly intentional within the meaning of 504(c)(2) for purposes of enhancing statutory damages.  Defendants knew their actions constituted an infringement each time it failed to serve an NOI or make a royalty payment.

187.    Defendants' knowledge may also be inferred from its conduct including the reckless disregard of the Plaintiffs' and Putative Class' rights (rather than actual knowledge of infringement), which suffices to warrant award of the enhanced damages.

188.    As a direct and proximate result of each of the Defendant's infringement, Plaintiffs and the Putative Class have incurred damages, as described more fully above.  Pursuant to 37 C.F.R. § 385, Plaintiffs and the Putative Class are entitled to a "per stream" statutory royalty rate of $.01 for interactive web-based streaming services like Defendants'.

189.    Plaintiffs and the Putative Class may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each infringement of each copyright registration identified in **Exhibit A** and those that will be produced for the Putative Class, as available under the law.

190.    Each time the Plaintiffs were deprived of their statutory royalty entitlement, e.g., by non-payment of royalties, a distinct harm was done to Plaintiffs' property interest. Defendants Defendants continued streaming of Plaintiff's Copyrighted Compositions, after it was served with notice on June 20, 2015, is clearly an intentional infringement under the Act. Defendants' predatory conduct was clearly intentional within the meaning of 504(c)(2) for purposes of enhancing statutory damages.  Defendants knew that its actions constituted an infringement each time it failed to serve an NOI or make a royalty payment.

191.    Defendants' knowledge may also be inferred from its conduct including the reckless disregard of the Plaintiffs' right (rather than actual knowledge of infringement), which suffices to warrant award of the enhanced damages.

192.     As a direct and proximate result of each of the Defendants' infringement, Plaintiffs have incurred damages, as described more fully above. Pursuant to 37 C.F.R. § 385, Plaintiffs are entitled to a "per stream" statutory royalty rate of $.01 for interactive web-based streaming services like Defendant.

193.     Plaintiffs may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each infringement of each copyright registration identified in **Exhibit B**, as available under the law.


### THIRD CLAIM FOR RELIEF
**(New York General Business Law §  349 - Deceptive acts and Practices Unlawful.)**

194.     Plaintiffs and the Putative Class reallege and incorporate by reference each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set for that length herein.

195.     On information and belief, Plaintiffs and the Putative Class allege Defendants: (a) depress the value of the royalties owed to Plaintiff and the Putative Class Members' for use of their Copyrighted Compositions through an arbitrary and non-negotiated payment structure; and (b) capture and hold funds which are otherwise distributable and earns interest thereon, thereby profiting off its own unlawful conduct.

196.     These business practices are unlawful and unfair pursuant to New York's General Business Law §  349.

197.    As a direct and proximate result of Defendants' conduct alleged herein, Plaintiffs and the Putative Class Members are entitled to recover all proceeds and other compensation received or to be received by Defendants for their failure to pay royalties.

198.    This includes any interest accrued on the royalty funds inappropriately withheld from Plaintiffs and the Putative Class Members.

199.    Plaintiffs and the Class Members have been damaged, and Defendants have been unjustly enriched, in an amount that is not as yet fully ascertained but which Plaintiffs are informed and believe is not less than $150,000 according to proof at trial.

200.    Unless the Court enjoins and restrains defendants' conduct, Plaintiffs and the Putative Class Members will continue to endure great and irreparable harm that cannot be fully compensated or measured in monetary value alone.  Accordingly, Plaintiff and the putative Class Members are entitled to temporary, preliminary and permanent injunctions, prohibiting  further acts of unfair competition pursuant to New York's General Business Law §  349.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves, and all other persons similarly situated, respectfully prays this Court enter an order Defendants as follows:

1)      Certifying this matter as a class action;

2)      Appointing Plaintiffs as class representative and Plaintiffs' counsel as class counsel;

3)      Entering injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Class (17 U.S.C. § 502), including enjoining   Defendant from continued copyright infringement and violations of the relevant provisions of the Copyright Act;

4)      A temporary, preliminary, and permanent injunction enjoining and restraining Defendants, and its respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliates, companies, successors, assigns, and those acting in concert with them or at their direction, from further violations of New York's General Business Law §  349;

5)      Injunctive relief that requires Defendants to pay for the services of a third party auditor to identify the owners of Compositions reproduced and/or distributed by Defendants despite Defendants' failure to first obtain a mechanical license prior to reproducing and/or distributing the Copyrighted Compositions, and further requiring Defendants to remove all such Copyrighted Compositions from its services until it obtains proper licenses for them;

6)      Restitution of Defendants unlawful proceeds, including Defendant's gross profits;

7)      Awarding compensatory damages to Plaintiffs and the Putative Class in an amount to be ascertained at trial;

8)      Awarding statutory damages to Plaintiffs and the Putative Class according to proof, including but not limited to all penalties authorized by the Copyright Act (17   U.S.C. §§ 504(c)(1), 504(c)(2));

9)      Awarding reasonable attorneys' fees and costs (17 U.S.C. § 505);

10)     Awarding Plaintiffs and the putative Class pre- and post-judgment interest to the

extent allowable; and,

11)     Award such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: February 26, 2016                         GARBARINI  FITZGERALD P.C.

By: _____

Richard M. Garbarini (RG 5496)
250 Park Avenue
7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9479